499 So.2d 184 (1986)
Deborah CUMMINGS
v.
Juanita WAFER, Felisha D. Wafer & Protective Casualty Ins. Co.
Jacqueline JEFFERSON, Indiv. and as Duly Qualified Natural Tutor of Minor Travis Jefferson
v.
Juanita WAFER, Felisha D. Wafer & Protective Casualty Ins. Co.
Jacqueline SCHIELE
v.
Juanita WAFER, Felisha D. Wafer & Protective Casualty Ins. Co.
Nos. 18091-CA to 18093-CA.
Court of Appeal of Louisiana, Second Circuit.
October 29, 1986.
*185 Bruscato, Loomis & Street by Anthony J. Bruscato, Monroe, for Deborah Cummings.
Lunn, Irion, Johnson, Salley & Carlisle by Charles W. Salley and Theodore J. Casten, Shreveport, for Protective Cas. Ins. Co.
William Armstrong, Monroe, for Juanita Wafer and Felisha Wafer.
Before JASPER E. JONES, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
These three consolidated cases arise from a collision between two vehicles at the intersection of North 18th and Arkansas St. in Monroe on July 23, 1984. The plaintiffs are Deborah Cummings, Jacqueline Schiele, Jacqueline Jefferson and Travis Jefferson, the minor son of Jacqueline Jefferson. Plaintiffs are sueing Felicia Wafer, the minor who was driving the other car, her mother Juanita Wafer and Protective Casualty Insurance Company. After the case was closed and briefs submitted, the judge granted Protective's motion to re-open the case for additional information to show cancellation. The court awarded plaintiffs a judgment against Felicia Wafer and her mother. The trial judge rejected the plaintiffs' claim against Protective finding the policy had been cancelled and therefore there was no coverage. The plaintiffs were granted both special damages for medical expenses and general damages. All plaintiffs appeal. There is no issue of liability presented. The only issues before us are the re-opening of the case, the dismissal of Protective and the quantum of damages awarded.
We find merit in only one assignment of error, Jacqueline Jefferson's complaint that her award of medical expenses was not complete. We modify and affirm the judgment.
Juanita Wafer had purchased liability insurance from Ora Brooks Insurance Agency, financing the premiums through Oupac, Inc. The policy was written by Protective Casualty. The term of the policy was from February 13, 1984 to February 13, 1985. Protective denies coverage, claiming that the policy was effectively cancelled long before the accident. The issue of cancellation was disputed at trial. After both sides had rested Protective made and was granted a motion to re-open the trial for additional testimony and evidence on the issue of cancellation. At the second hearing Protective introduced documents and testimony showing the notice of cancellation and certifying statement from Oupac and the premium refund sent to Oupac. The plaintiffs argue that the trial court should not have re-opened the trial, and that even considering the additional evidence Protective did not prove cancellation of the policy. They contend the policy was still in force and there was coverage by Protective since the accident occurred during the original term of the policy.

RE-OPENING
A trial court's decision to re-open a case for the production of additional evidence is within his sound discretion and will not be disturbed on appeal absent a clear abuse of discretion. LSA-C.C.P. art. 1632; Succession of Lefort, 139 La. 51, 71 So. 215 (1916); Brass v. Minnieweather, 468 So.2d 611 (La.App. 2d Cir.1985). The trial was held on October 9, 1985 and the motion to re-open was made October 28. Protective's request was that they be allowed to introduce evidence that they had inadvertently omitted at the original hearing. Frances Walker, an employee of Oupac, Inc. was called to identify the request for cancellation that Protective had intended to produce at the first hearing, but had allegedly misplaced. J.E. Brignac, who is Vice-President *186 of Protective and Vice-President of Opelousas Underwriters was also a witness at the second hearing. Brignac, who was not called at the initial trial, testified about the relationship between Opelousas and Protective and the premium refund, and the refund check was introduced into evidence at that time. The trial judge reopened the case because he felt that the ends of justice would best be served by allowing additional evidence to be presented. We uphold the trial court's decision on this issue, although we would have had no hesitation in affirming a denial of the motion for re-opening the trial. This is a very close call but we yield to the trial judge's great discretion. Had this motion been before us originally, it would probably have been denied. No showing of an abuse of discretion has been made in this case, and therefore we do not hold that the trial court's decision to re-open the case for additional evidence and the introduction of other documents is manifestly erroneous.

INSURANCE COVERAGE
Wafer had financed the insurance premiums through Oupac, a premium finance company. She failed to make her payments, and Oupac sent Wafer a notice of cancellation on April 24, 1984, with an effective date of May 6, 1984. Oupac has the power to cancel the insurance policy pursuant to LSA-R.S. 9:3550.[1] Wafer's contract *187 with Oupac, the premium finance company, contained a power of attorney granting Oupac the power to act for Wafer and cancel the policy with Protective if Wafer failed to make her payments to Oupac. According to 9:3550, the only notice Wafer is entitled to receive is the notice of cancellation from Oupac to her. Certain third parties must be notified by either Protective or Oupac. Oupac is required to request Protective to cancel the policy, and to effectuate cancellation Protective must refund the unearned premiums to Oupac. This seemingly simple transaction is confused by the fact that Protective has a general managing agency, Opelousas Underwriters, who handles almost all matters except claims. The notice of cancellation, which was addressed to Protective, was actually given to Opelousas. Likewise, the refund of unearned premiums was actually from Opelousas to Oupac. In the second hearing Protective introduced the notice of cancellation and certifying statement that had been sent to Opelousas from Oupac, as well as J.E. Brignac's testimony that Opelousas had cancelled the policy and that Opelousas is the general managing agency for Protective.
For Oupac to effectively cancel Wafer's insurance policy upon default of the finance contract payments, the premium finance company must proceed in accordance with 9:3550. The statute requires that the following conditions be met:
1. The debtor/insured has defaulted on the premium finance contract.
2. There is a power of attorney clause in the debtor's contract with the premium finance company.
3. The premium finance company has mailed a notice of cancellation to the insured and to the insured's insurance agent.
4. Either the premium finance company or the insurer has notified any mortgagee, governmental agency, or other interested third party indicated by the policy.
5. After a ten day delay in which the debtor had not made a payment, the premium finance company sent a copy of the notice of cancellation to the insurer, with a statement certifying compliance with 9:3550 G(3).
6. The insurer has refunded any unearned premiums to the premium finance company within sixty days.
The first two requirements are not disputed. Juanita Wafer admits she never made the payments, and the policy in question *188 contains the necessary power of attorney clause.[2]
As for the third requirement, Ora Lee Brooks, Wafer's insurance agent, testified that Brooks had received her copy of the cancellation notice. The trial court found that Oupac had mailed and Wafer had received the notice of cancellation. Frances Walker, an employee of Oupac, testified that the notice of cancellation had been prepared, and explained the normal business practices that indicated that it had been mailed. Furthermore, Wafer admitted to Brooks in a telephone conversation that she had received the notice; in fact, on the evening of the accident, Wafer asked Brooks for a backdated policy, thus strongly suggesting that Wafer doubted the validity of her policy. These circumstances constitute sufficient evidence in the record to support the trial court's findings. When a finding of fact is not clearly wrong, it will not be disturbed on appeal. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The trial court also found that the mortgagee, Peoples' Loan Service, had been sent a copy of the notice of cancellation. Relying on the trial court's great discretion in factual matters, we must find that the fourth criteria was also met. Arceneaux v. Domingue, supra.
We have already seen that at least part of the fifth requirement was complied with. The notice was mailed to Juanita Wafer on April 24, 1984, and delivered to Protective on May 14, 1984. Wafer does not contend that she made her payment during that time. The adequacy of this notice has not been questioned. The area of dispute is whether the notice was mailed to the insurer as required. Walker testified that the notice was addressed to Protective and sent to Opelousas. The plaintiffs argue that this was not adequate compliance with 9:3550, which requires sending a copy of the notice to the insurer. Brignac explained that Opelousas is the general managing agency for Protective and handles almost all matters except claims. Even though the statute specifies that the notice must be mailed to the insurer, an agent acting within his authority is the same as the principal acting. LSA-C.C. art. 2985; Destrehan v. La. Cypress Lumber Co., 45 La.Ann. 920, 13 So. 230 (1893); Guillory v. Braswell Motor Freight Lines, Inc., 256 So.2d 646 (La.App. 2d Cir.1972), writ refused 258 So.2d 381 (La.1972). An agent's knowledge is attributed to his principal. Weingart v. Delgado, 284 La. 752, 16 So.2d 254 (1943); Richardson v. Stan Weber & Associates, Inc., 400 So.2d 1196 (La.App. 1st Cir.1981). Notice to the general managing agency is notice to the insurer as required by 9:3550.
A check for unearned premiums was mailed by Opelousas to Oupac on June 8, 1984, within sixty days of when the notice was mailed to the insurer. This satisfies the sixth requirement of the statute. Plaintiffs again argue lack of compliance with 9:3550 on the grounds that the statute requires the insurer, not the managing agent, to refund the money. For the reasons set forth above, Opelousas' acts are attributed to Protective. We agree with the trial court in holding that Protective complied with the statute so as to effectively cancel the insurance policy.

DAMAGES
Dr. Chin, who treated all four plaintiffs, was unable to testify at trial,[3] and thus the medical information was very sparse indeed.[4] *189 The plaintiffs contest the awards of damages, each plaintiff claiming that her award of general damages was too low. Jacqueline Jefferson also argues the trial court should have included her pregnancy test as a medical expense related to the accident.
Cummings was awarded $947.60 in special damages and $1,800 for general damages. She asks that her general damages be increased to $6,500. The trial court found that her injuries consisted of pains in the left knee, neck and head. She was taken to Conway Hospital by ambulance immediately after the accident and treated by Dr. Chin the following day. He prescribed pain pills, muscle relaxants and crutches. Dr. Chin treated her on four subsequent occasions, the last one being on August 29, 1984. These additional visits were primarily for heat treatments. The trial court found that Cummings was substantially recovered some six weeks after the accident.
Jacqueline Schiele received $650 for her medical expenses and $900 in general damages. She seeks $4,000 in general damages. The injuries resulting from the accident were a bruise on her upper arm, mild lower-back strain, and a cracked tooth. She had this tooth removed and other dental work done at that time, but it was stipulated that she had pre-existing dental problems. She saw Dr. Chin a total of five times. Most of these visits were to receive heat treatments. He prescribed no other therapy.
Jacqueline Jefferson was unable to testify at trial. She was awarded $400 in special damages and $170 for general damages. Jefferson complains that the trial court should have included a pregnancy test as an element of special damages, and that her general damages should have been $4,000. Jefferson went to Conway immediately after the accident, where she was found to have no signs of injury. She later visited Dr. Chin, who reported tenderness and lessened motion in the cervical spine, lower back, left hip, right knee, and left elbow. Jefferson never returned to Dr. Chin after the initial examination. The doctor did not take X-rays or prescribe medication because of a suspected pregnancy. He performed a pregnancy test, which was positive. The trial court erroneously refused to consider this test a part of the special damages. While obviously the pregnancy was not a result of the accident, the test was made necessary by the accident. Had Dr. Chin prescribed a course of treatment that injured the fetus, Jefferson might have had a cause of action against the defendants for that injury. When there is a suspected pregnancy, and the proposed treatments such as X-rays and medication could injure the fetus, a pregnancy test is within the realm of foreseeable damages caused by the accident. Buchert v. Jurrissich, 232 So.2d 890 (La.App. 4th Cir.1970).
Travis Jefferson, who did not testify, was three years old at the time of trial. He received $240 in special damages and $150 in general damages. He complained of headaches, stomach aches, and pain in his left arm. Dr. Chin found no damage and merely prescribed aspirin and a medicine for stomach aches. Jefferson seeks $1,500 in general damages.
The trier of fact is given great discretion in establishing awards for general damages. An abuse of this discretion must be clearly demonstrated in the record before this determination will be disturbed on appeal. Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974).
None of these awards was so low as to be an abuse of the trial court's great discretion in setting general damages. Each case is to be determined in light of its own particular facts and circumstances, not in comparison with other tort cases. Anderson v. Welding Testing Laboratory, Inc., supra. The injuries here were not *190 severe, and the trial court's superior judgment in light of his ability to observe the witnesses and determine their actual condition should be respected.
We affirm the trial court's damage awards, except to award Jacqueline Jefferson an additional $20 in special damages, since we find that a pregnancy test given before prescribing treatment or X-rays when there is a suspected pregnancy should be considered a legitimate expense arising from the accident and therefore chargeable to the defendants in this case.
We amend and re-cast paragraph five of case # 85-1058 to reflect this small quantum increase. That part of the judgment which reads "IT IS ORDERED, ADJUDGED AND DECREED that there be judgment ... in favor of Jacqueline Jefferson, individually, and against Juanita G. Wafer and Felicia D. Wafer in the full sum of Four Hundred Dollars ($400.00) general damages and medical expenses in the amount of One Hundred Seventy Dollars ($170.00) ..." is changed so that the medical expenses total "One Hundred Ninety Dollars (190.00)."
Costs of the appeal are assessed to appellants.
AMENDED AND AFFIRMED.
NOTES
[1] LSA-R.S. 9:3550 provides in pertinent part:

G. Insurance contracts may be cancelled upon default as follows:
(1) When a premium finance agreement contains a power of attorney enabling the insurance premium finance company to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be cancelled by the insurance premium finance company unless such cancellation is effectuated in accordance with this Subsection.
(2) Upon default of insurance premium contract by the debtor, the premium finance company may mail a notice of cancellation to the insured, at his last known address as shown on the records of the insurance premium finance company. A copy of the notice of cancellation of the insurance contract shall also be mailed to the insurance agent negotiating the related insurance contract whose name and place of business appears on the premium finance agreement. Such notice of cancellation shall show the name of any governmental agency, mortgagee or third party also requiring notice of cancellation as shown on the insurance premium finance contract.
(3) Ten days after notice of cancellation has been mailed to the insured, if the default has not been cured, the insurance premium finance company may thereafter effect cancellation of such insurance contract or contracts by mailing to the insurer a copy of the notice of cancellation together with a statement certifying that:
(a) The premium finance agreement contains a valid power of attorney as provided in paragraph (1) above;
(b) The premium finance agreement is in default and the default has not been timely cured;
(c) Upon default, a notice of cancellation was mailed to the insured as provided in paragraph (2) above, specifying the date of mailing by the premium finance company to the insured; and
(d) Copies of the notice of cancellation were mailed to all persons shown by the premium finance agreement to have an interest in any loss which may occur thereunder, specifying the names and addresses of any governmental agencies, mortgagees or third parties to whom the insurance premium finance company has sent notice of cancellation.
Upon receipt of such notice of cancellation and statement from the premium finance company, the insurer shall be entitled to consider that cancellation of the insurance contract or contracts has been requested by the insured but without requiring the return of the insurance contract or contracts and the insurer may proceed to cancel such contract or contracts as provided in R.S. 22:637. The effective date of cancellation shall be as of 12:01 A.M. on the tenth day after the date of mailing of the notice of cancellation as shown in said statement furnished to the insurer by the premium finance company.
The receipt of such notice and statement by the insurer shall create a conclusive presumption that the facts stated in said notice and statement are correct, that the insurer is entitled to rely on such facts and that the cancellation of the insurance contract or contracts is concurred in and authorized by the insured. No liability of any nature whatsoever either in favor of the insured, any governmental agency, mortgagee or third party shall be imposed upon the insurer as a result of any misstatement of fact contained in said notice of cancellation or statement furnished by the insurance premium finance company to the insurer, or as result of failure by the insured, any governmental agency, mortgagee or third party to receive the notice of cancellation required by paragraph (2) above, or as a result of failure of the insurance premium finance company to comply with any of the requirements of this Subsection. Upon mailing of any unearned premium to the insurance premium finance company as soon as practicable following such cancellation, the insurer shall be fully discharged from all liability under the insurance contract or contracts for any loss occurring subsequent to the effective date of cancellation.
(4) Upon receipt of the notice of cancellation, the insurer shall give notice to any other governmental agency, mortgagee, or other third party as shown in the records of the insurer requiring statutory regulation or contractual notice and which were not given by the premium finance company as provided in (3) above. The insurer shall give the prescribed notice on behalf of itself or the insured to any governmental agency, mortgagee, or third party on or before the fifth business day after the day it receives a copy of the notice of cancellation from the insurance premium finance company and shall determine the effective date of cancellation taking into consideration the number of days notice required to complete the cancellation if such notice is given by the insurer, otherwise the effective date of cancellation shall be calculated from the date the premium finance company mailed the notice to such governmental agency, mortgagee, or other third party taking into consideration the number of days notice required to complete the cancellation.
H. Whenever a financed insurance contract is cancelled, the insurer shall return whatever gross unearned premiums, less any unearned commissions due the insurer, are due under the insurance contract to the insurance premium finance company for the account of the insured or insureds as soon as reasonably possible but in no event shall the period for payment exceed sixty days after the effective date of cancellation. In the event that the crediting of return premiums to the account of the insured results in a surplus over the amount due from the insured, the insurance premium finance company shall refund such excess to the insured provided that no such refund shall be required if it amounts to less than one dollar.
[2] POWER OF ATTORNEY: I hereby irrevocably appoint Oupac, Inc., of Opelousas, La, or its assigns my lawful attorney-in-fact to deliver to you my original policy or lost policy release for cancellation of this financed policy or to request cancellation for non-payment of premium in the event of my default in premium payment to Oupac, Inc., of Opelousas, La, and/or its assigns. To collect all return premiums due to me, including returns on endorsements and further empower them to sign any necessary written instruments including endorsements of return premium checks. I hereby ratify any and all acts that my attorney may do or perform hereunder.
[3] Dr. Chin was convicted of Medicare fraud and illegally dispensing prescriptive medicine.
[4] The trial court did not comment on the credibility of the witness, or the weight of his evidence, which was brought in through unsworn and uncross-examined letters that Dr. Chin had written to the plaintiff's attorney.